**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOEY EDWARD WEBB, | ) | CASE NO. 1:17CV2707 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Joey Edward Webb ("Plaintiff" or "Webb"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

In March 2015, Webb filed applications for POD, DIB, and SSI, alleging a disability onset date of January 9, 2014 and claiming he was disabled due to back spurs, arthritis, and degenerative disc disease.  (Transcript ("Tr.") at 10, 177-183, 212.)  The applications were denied initially and upon reconsideration, and Webb requested a hearing before an administrative law judge ("ALJ").  (Tr. 10, 92-105, 108-120.)

On November 2, 2016, an ALJ held a hearing, during which Webb, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 32-54.)  On March 28, 2017, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 10-22.)  The ALJ' s decision became final on November 3, 2017, when the Appeals Council declined further review.  (Tr. 1-6.)

On December 29, 2017, Webb filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 16.)  Webb asserts the following assignment of error:

> (1)    The Administrative Law Judge erred in finding that Plaintiff is capable of performing medium work.

(Doc. No. 15.)

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Webb was born in December 1958 and was fifty-seven (57) years-old at the time of his administrative hearing, making him a "person of advanced age," under social security regulations.  (Tr. 16.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  He has a limited education and is able to communicate in English.  (*Id.*)  The ALJ found he has past relevant work as a truck

driver (medium, semi-skilled, SVP 4); lubrication servicer (medium, semi-skilled, SVP 4); and bartender (light, semi-skilled, SVP 3). (Tr. 16.)

**B.     Relevant Medical Evidence[2]**

On October 15, 2014, Webb presented to the emergency room ("ER") with complaints of chronic lower back pain. (Tr. 387-393.) On examination, Webb had full range of motion in his back, no bony tenderness, no radiculopathy, no neuro-focal deficits, negative straight leg raise, full muscle strength in all extremities, and normal gait. (Tr. 388.) He was discharged in stable condition and advised to follow up with Physical Medicine & Rehabilitation ("PM&R"). (*Id*.)

Shortly thereafter, on October 24, 2014, Webb established care with PM&R at MetroHealth. (Tr. 380-385.) He reported low back pain for the previous five to six years. (*Id*.) Webb could not recall any specific event that triggered his pain, but did state he had been in a motor vehicle accident in 1997. (Tr. 380-381.) Webb rated his pain a 4 on a scale of 10 and stated it was aggravated most by forward flexion and prolonged standing. (Tr. 381.) He had tried Voltaren and Robaxin, which helped "slightly." (*Id*.) On examination of Webb's back, Wayne Hsiao, M.D., noted normal curvature of his thoracic and lumbar spines, no tenderness to palpation, mildly increased paraspinal tone, limited range of motion, and negative straight leg raise. (Tr. 383.) Dr. Hsiao also found 5/5 muscle strength in Webb's lower extremities, intact sensation, and normal reflexes. (*Id*.) He assessed chronic low back pain, likely discogenic in etiology with no neurological deficits. (*Id*.) Dr. Hsiao refilled Webb's prescriptions, and recommended physical therapy. (*Id.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On November 12, 2014, Webb established care with primary care physician Ann Marie Kieber-Emmons, M.D. (Tr. 373-378.) He stated "he has had depression and suicidal thoughts in the past," but did not currently have suicidal ideation. (Tr. 373.) Webb indicated he did not want to speak to a psychiatrist and did not feel he needed medication. (Tr. 373-374.) He also reported chronic lower back pain. (Tr. 375.) On examination, Dr. Kieber-Emmons found Webb was alert and oriented with a normal affect, good mood, and no spinal tenderness. (Tr. 375.) She assessed hypertension and chronic back pain, ordered blood work, and refilled Webb's prescriptions. (*Id.*)

On that same date, Webb presented for physical therapy with Elizabeth Musser, P.T. (Tr. 366-371.) He complained of upper lumbar pain that worsened with yard work, standing to prepare food, sleeping, sitting in an unsupported position, and playing pool. (Tr. 367.) Webb rated his pain a 4 on a scale of 10, but stated it varied in intensity from a 3 to an 8 out of 10. (*Id.*) On examination, Ms. Musser noted negative straight leg raise, tenderness to palpation at L2-L3, shortened flexibility, and a labored but independent ability to change positions from sit to stand. (Tr. 368-369.) Ms. Musser assessed as follows:

> Joey Webb is a 55 year old male who has had flare of chronic pain, likely due to overdoing it with odd jobs. Initially, injured lumbar region in [motor vehicle accident] 10+ yrs ago and limited his ability to continue with construction work. Has had [physical therapy at the VA] but not extension progression program that appears appropriate with his extension [movement] preference. Pain remained centralized during exam. He presents with decreased ability to activate core stabilizers, poor body mechanics, posture faults and decreased flexibility of [lower extremities], likely contributing to movement and muscle imbalances in core & lower body, difficulty sitting unsupported, meal prep, tolerating prolonged postures and working.

(Tr. 369.) Ms. Musser recommended six physical therapy sessions. (*Id.*)

The record reflects Webb presented for physical therapy on November 20, December 4, December 11, December 18, and December 22, 2014. (Tr. 361-364, 356-359, 351-354, 346-349, 334-338.) On November 20, 2014, Webb rated his lower back pain a 0 on a scale of 10 at the beginning of the session, but stated it increased to a 3 out of 10 by the end of the session. (Tr. 361-362.) On December 4, 2014, Webb's pain again increased after therapy but was "soothed with moist heat." (Tr. 356-357.) On December 11, 2014, Webb engaged in a TENS unit trial, but reported it did not provide pain relief. (Tr. 351-352.) The following week, Webb rated his pain a 2 on a scale of 10, and indicated it was aggravated by prolonged standing and walking. (Tr. 346.) On December 22, 2014, Ms. Musser noted Webb had shown "no improvement" since beginning physical therapy. (Tr. 334.) She recommended two additional visits to "practice/perfect for re-injury prevention." (Tr. 336.) On January 15, 2015, however, Webb was discharged from physical therapy due to lack of attendance. (Tr. 333.)

Meanwhile, Webb returned to PM&R on December 19, 2014. (Tr. 339-343.) He reported as follows:

> Today Mr. Webb states his back pain is "about the same", on average 4/10. Has gone through 5 sessions of [physical therapy] and says he is doing his home exercises, but has noticed no improvement. Still taking Robaxin 3-4 times per day and Voltaren once per day. States he does not notice much of a difference with these. * * * Today states standing is the worst but also still has pain with prolonged sitting. No radiation of symptoms into legs, states sometimes it feels like it goes up the back. Has also tried heat, ice, and TENS without relief.

(Tr. 339.) On examination of Webb's back, Dr. Hsaio noted normal curvature of the thoracic and lumbar spines, tenderness to palpation at L3-L4, limited range of motion, and negative straight leg raise. (Tr. 340, 341.) He also found 5/5 muscle strength in Webb's lower extremities, intact sensation, and normal reflexes. (*Id.*) Dr. Hsaio assessed "chronic low back

pain, likely predominantly discogenic etiology with spondylogenic features." (Tr. 340.) He increased Webb's Voltaren, recommended further physical therapy, and ordered an x-ray of Webb's lumbar spine. (*Id.*) Webb underwent the lumbar x-ray that same day. (Tr. 344.) It revealed minimal degenerative changes of the lumbar and distal thoracic spines with no acute osseous abnormality. (*Id*.)

On January 21, 2015, Webb returned to Dr. Kieber-Emmons for follow-up. (Tr. 303-306.) Dr. Kieber-Emmons indicated Webb's chronic depression was stable and that he was "not interested" in psychiatric treatment or medication. (Tr. 304.) Physical examination revealed normal gait. (Tr. 305.)

On February 9, 2015, Webb spoke to Dr. Hsaio and inquired about applying for disability. (Tr. 256.) Dr. Hsaio responded as follows: "I said he is free to bring in paperwork for me to fill out, but I would have to be honest in the report. Based on the fact that he has axial back pain without neurological deficits, minimal findings on x-ray, and his overall symptoms profile, he would have minimal restrictions on sitting, standing, and lifting weights and I told him I think it would be unlikely he would be awarded [disability benefits]." (*Id*.)

Webb spoke again with Dr. Hsaio on February 26, 2015. (Tr. 257.) Dr. Hsaio explained that Webb "did have a small amount of arthritis" but it was "pretty minimal and although this is not 'normal,' it is a common finding as we get older." (*Id*.)

On April 15, 2015, Webb returned to Dr. Kieber-Emmons. (Tr. 300-302.) He stated it "does not feel like anything is helping" his back pain. (Tr. 301.) On examination, Dr. Kieber-Emmons found no spinal tenderness and indicated Webb was able to get onto the exam table

without assistance.  (*Id*.)  She prescribed Cymbalta and offered to prescribe Neurontin, but Webb

declined.  (Tr. 302.)

On May 13, 2015, Webb indicated he could not afford Cymbalta.  (Tr. 297-298.)  Dr.

Kieber-Emmons prescribed Elavil, and advised Webb to do home exercises and use a heating

pad to alleviate his pain.  (*Id*.)  She also noted Webb had "depressive/anger tendencies, and

almost a feeling of apathy towards institutions at times."  (*Id*.)

Several months later, on July 10, 2015, Webb returned to PM&R for follow-up regarding

his chronic back pain.  (Tr. 401-406.)  He reported as follows:

> Today Mr. Webb states his back pain is "about the same", on average 5/10.  He
> finished 6 visits of [physical therapy] back in December (2014) which didn't seem
> to help.  He is doing [a home exercise program] about 3 times per week and has a
> new abdominal machine which he started working with about a week ago and is
> hopeful that it will help.  He describes his pain as dull in nature with occasional
> sharp pain.  States that sitting and standing long periods worsen his pain while
> reclining in his chair tends to alleviate it.  He denies any radiating pain.  He denies
> any [numbness/tingling] or weakness. He was prescribed Voltaren last visit but did
> not get it filled.  He thinks the reason is "because it was too expensive" but he can't
> recall.

(Tr. 401.)  On examination of Webb's back, PM&R physicians Jason Dancy, M.D., and Daniel

Malkamaki, M.D., noted normal curvature of the thoracic and lumbar spines, no tenderness to

palpation, moderately increased paraspinal tone, limited range of motion, pain with facet

loading, and negative straight leg raise.  (Tr. 402-403.)  Examination also revealed 5/5 muscle

strength in Webb's lower extremities, intact sensation, normal reflexes, and normal gait.  (*Id*.)

Drs. Dancy and Malkamaki assessed chronic lower back pain, likely predominantly discogenic

etiology with spondylogenic features.  (Tr. 402.)  They prescribed Mobic and advised Webb to

continue his home exercises.  (Tr. 402-403.)

On September 1, 2015, Webb established care with primary care physician Laura Mintz, M.D. (Tr. 408-416.) He reported Mobic was not helping his back pain, and stated "the only thing that helps is sitting in a chair." (Tr. 409.) On examination, Dr. Mintz noted a stooped posture, shuffling gait, and reduced breath sounds. (Tr. 411.) She also found normal pulses and no clubbing, cyanosis, or edema. (*Id.*) Dr. Mintz switched Webb to Daypro, noting "he won't take Neurontin." (Tr. 412.) She also encouraged Webb to continue with physical therapy and conditioning. (Tr. 413.)

Webb returned to Dr. Dancy on October 16, 2015. (Tr. 418-423.) He stated his back pain was "about the same since last visit," rating it a 3 on a scale of 10. (Tr. 418.) Webb indicated that prolonged sitting and standing worsened his pain, while "reclining in his rocking chair tends to alleviate it." (*Id.*) Examination of Webb's back revealed normal curvature of his thoracic and lumbar spines, no tenderness to palpation, moderately increased paraspinal tone, limited range of motion with pain, and negative straight leg raise. (Tr. 419-420.) Dr. Dancy also noted 5/5 muscle strength in Webb's lower extremities, intact sensation, and normal reflexes. (*Id.*) He adjusted Webb's medications, discontinuing the Mobic and prescribing Lodine. (Tr. 420.) Dr. Dancy also noted as follows: "We discussed that chronic back pain is difficult to treat and he is on the right medications. Since his pain is not acute opiates are not an appropriate treatment option. We discussed if the Lodine does not help we really don't have anything else to offer." (*Id.*)

On January 22, 2016, Webb again reported his "back pain is about the same since the last visit." (Tr. 427.) He rated his pain a 5 on a scale of 10, but stated it can get to an 8 out of 10 at its worst. (*Id.*) Examination revealed normal curvature of Webb's thoracic and lumbar spines,

tenderness to palpation, moderately increased paraspinal tone, limited range of motion with pain, negative straight leg raise, 5/5 muscle strength in Webb's lower extremities, intact sensation, and normal reflexes. (Tr. 428.) Dr. Dancy stressed the importance of home exercises and continued Webb on his medication. (Tr. 429.)

Webb returned to Dr. Mintz on March 1, 2016. (Tr. 435-445.) He reported he had "been depressed, has been for a long time." (Tr. 435.) Webb also complained of back pain, but continued to refuse to take Neurontin. (Tr. 437.) Dr. Mintz prescribed Cymbalta for pain and depression. (*Id*.)

On May 27, 2016, Webb returned to Drs. Dancy and Malkamaki at PM&R. (Tr. 458-463.) He stated "his back pain is about the same," although he noted some intermittent radiating symptoms into his left lower rib over the last month or so. (Tr. 458.) Webb rated his pain a 5 on a scale of 10, but stated it can get to an 8 out of 10 at its worst. (*Id*.) He reported "mild relief" with Lodine and stated he was not interested in doing any more physical therapy. (*Id*.) Examination revealed normal curvature of Webb's thoracic and lumbar spines, tenderness to palpation at L4-L5, moderately increased paraspinal tone, limited lumbosacral range of motion, negative straight leg raise, 5/5 muscle strength in his lower extremities, normal gait, normal reflexes and intact sensation. (Tr. 460.) Drs. Dancy and Malkamaki assessed chronic low back pain, lumbar spondylosis, and thoracic spondylosis. (*Id*.) They continued Webb on his medication, stressed the importance of home exercises, and ordered a thoracic spinal x-ray. (*Id*.) Webb underwent the x-ray the same day, which revealed as follows:

> There are minor degenerative changes of the thoracic spine with small marginal spurs at multiple levels. There is a mild thoracic dextroscoliosis. Vertebral bodies maintain their height with no acute fracture nor abnormal subluxation. Pedicles are

> intact. Degenerative changes of the cervical spine most pronounced at C5-6 and C6-7. Possible anterolisthesis of C4 with respect to C6.

(Tr. 464.)

On September 30, 2016, Webb returned to Drs. Dancy and Malkamaki. (Tr. 479-485.) He reported "his pain is about the same, maybe slightly worse since he ran out of his Lodine about a month ago and did not get a refill." (Tr. 479.) Dr. Darcy noted Webb failed to refill his prescriptions for either Lodine or Cymbalta. (*Id.*) Examination findings were the same as his previous visit. (Tr. 480, 481.) Webb was continued on his medications and again advised of the importance of his home exercise program. (*Id.*)

## C. State Agency Reports

On April 13, 2015, state agency physician Stephen Sutherland, M.D., reviewed Webb's medical records and determined he did not have a severe physical impairment. (Tr. 58-59.)

Subsequently, on July 28, 2015, state agency physician Rannie Amiri, M.D., reviewed Webb's medical records and determined he suffered from the severe impairment of degenerative disc disease, disorders of the back. (Tr. 74.) She also completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 75-76.) Therein, Dr. Amiri determined Webb could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (*Id.*) Dr. Amiri found Webb could frequently crawl, stoop, and climb ladders/ropes/scaffolds and, further, that he had an unlimited capacity to balance, kneel, crouch, push/pull, and climb ramps/stairs. (*Id.*) Finally, Dr. Amiri concluded Well had no manipulative, visual, communicative, or environmental limitations. (*Id.*)

**D.      Hearing Testimony**

During the November 2, 2016 hearing, Webb testified to the following:

- He completed the 10th grade.  (Tr. 35.)  He lives alone in a second-floor apartment.  (Tr. 37, 41, 44.)  He must climb 18 stairs to get to his apartment.  (Tr. 44.)  "The more pain [he's] in, the harder it is" for him to climb stairs.  (*Id*.)

- He cannot work due to severe back pain.  (Tr. 35.)  He has experienced back pain since at least 2007.  (*Id*.)  It does not radiate into his legs, but does travel into his upper back and neck area. (Tr. 36.)  His pain level at the hearing was a 5 on a scale of 10.  (*Id*.)  He started using a cane three or four months ago, and was using it at the hearing.  (Tr. 36, 38.)  It was not prescribed by a doctor, but it helps him walk longer distances.  (Tr. 36.)

- He takes Etodolac (Iodine) for his pain.  (Tr. 37.)  It does not completely take the pain away but makes it more manageable.  (Tr. 38.)  He also uses a heating pad and does stretching exercises.  (Tr. 43.)  He did physical therapy in 2014, but it made the pain worse.  (*Id*.)

- On a typical day, he gets up at 7 a.m., takes his medications, and sits in the living room and reads.  (Tr. 37.)  He then gets up and cleans the house, goes to the laundromat, or mows the grass.  (*Id*.)  Prolonged standing and yard work aggravate his back pain. (Tr. 41.)

- He can stand for two to four hours before needing to sit down.  (Tr. 39.)  He can sit for about 30 minutes for needing to move around.  (*Id*.)  He can walk about four blocks before the pain "kicks in."  (Tr. 39-40.)  He would not be able to stand for six hours during an eight hour workday.  (*Id*.)  He is not sure how much he can lift, but he is not capable of lifting 25 pounds frequently.  (Tr. 40.)  He is most comfortable when in a reclined position.  (*Id*.)

- Bending is hard for him. (Tr. 44-45.)  He can squat, and can kneel for a short period.  (*Id*.)  He has difficulty sleeping due to his back pain.  (*Id*.)

- He feels depressed "at times."  (Tr. 44.)  He has difficulty concentrating due to his pain and depression.  (*Id*.)  He was prescribed Cymbalta in May 2016, but is no longer taking it.  (Tr. 43-44.)

The VE testified Webb had past work as a truck driver (medium, semi-skilled, SVP 4); lubrication servicer (medium, semi-skilled, SVP 4); and bartender (light, semi-skilled, SVP 3). (Tr. 45-48.)  The ALJ then posed the following hypothetical question:

11

This person is male, 57 years of age, same work background and educational background as Mr. Webb. This first person can lift/carry 50 pounds occasionally, 25 pounds frequently; can stand/walk six out of eight, can sit six out of eight; no limit on push, pull, or foot pedal.

This person can constantly use a ramp or stairs, frequently use a ladder, rope, or a scaffold; can constantly balance, frequently stoop; constantly kneel and crouch, frequently crawl.

Reaching, handling, fingering, and feeling are all constant. Visual capabilities and communication skills are all constant. There are no environmental limitations, and that's it.

(Tr. 48-49.)

The VE testified the hypothetical individual would be able to perform Webb's past work as truck driver, lubrication servicer, and bartender. (Tr. 49.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as laundry worker (medium, unskilled, SVP 2), plastics worker (medium, unskilled, SVP 2), and packager (medium, unskilled, SVP 2). (Tr. 49-51.)

The ALJ then asked a second hypothetical that was the same as the first except that "now the lift/carry is 20 pounds occasionally, ten pounds frequently." (Tr. 51.) The VE testified the hypothetical individual would not be able to perform Webb's past work as a truck driver or lubrication servicer, but would be able to perform his past work as a bartender. (*Id*.) The hypothetical individual would also be able to perform other representative jobs in the economy, such as wire worker (light, unskilled, SVP 2), electronics worker (light, unskilled, SVP 2), and assembly press operator (light, unskilled, SVP 2). (*Id.*)

Webb's counsel then asked the VE the following hypothetical:

This hypothetical person is the same age, education, and past work experience as the claimant. He's limited to lifting 20 pounds occasionally, ten pounds frequently. He can sit, stand, or walk for four hours in an eight-hour workday. He's never to climb

ladders, ropes, or scaffolds, and occasionally climb stairs. He can occasionally crouch, crawl, kneel, squat, and stoop. He's further limited to simple, routine tasks in a static environment. Would that hypothetical worker be capable of performing any of the claimant's past work?

(Tr. 52.) The VE testified the hypothetical individual would not be able to perform Webb's past work as a truck driver, lubrication servicer, or bartender. (*Id*.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Webb was insured on his alleged disability onset date, January 9, 2014, and remained insured through December 31, 2017, his date last insured ("DLI.") (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Webb must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

14

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.      The claimant has not engaged in substantial gainful activity since January 9, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.      The claimant has the following severe impairment: Disorder of the back, degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404. Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work[3] as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant has no limitations on pushing or foot pedal. The claimant can constantly use a ramp and stairs. The claimant can frequently use ladders, ropes, and scaffolds. The claimant can constantly balance, kneel, and crouch. The claimant can frequently stoop and crawl. The claimant can constantly reach, handle, finger, and feel. The claimant can constantly see and communicate. The claimant has no environmental limitations.

6.      The claimant is capable of performing past relevant work as a truck driver, D.O.T. #905.663-014, medium exertional work, semi-skilled, SVP 4; lubrication servicer, D.O.T. #915.687-018, medium exertional work, semi-skilled, SVP 4; and bartender, D.O.T. #312.474-010, light exertional work, semi-skilled, SVP 3. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

---

[3] "Medium work" is defined as follows: "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine he or she can also do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling 83–10 clarifies that "a full range of medium work requires standing and walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting and carrying objects weighing up to 25 pounds." SSR 83–10, 1983 WL 31251 (1983).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from January 9, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-18.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support

16

another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

*RFC*

In his sole assignment of error, Webb argues the ALJ erred in concluding he is capable of performing medium work activity. (Doc. No. 15 at 6-12.) He maintains the ALJ's analysis of the medical evidence is flawed because the decision fails to acknowledge evidence substantiating the nature and severity of his back pain, including clinical examination findings of limited range of motion, tenderness, and shuffling gait. (*Id*.) Webb also maintains the ALJ "provides flawed reasoning in concluding that Plaintiff's activities are inconsistent with the limitations he alleges," complaining the ALJ fails to identify the specific activities that allegedly demonstrate he is capable of performing medium work on a sustained basis. (*Id*. at 9.) Webb asserts that "while the ALJ provides a recitation of portions of the medical record, he fails to recognize other various findings that consistently demonstrate the seriousness of Plaintiff's condition, and the limitations imposed by the same." (*Id*. at 10.) Lastly, Webb argues the ALJ erroneously included bartender as past relevant work, arguing it does not qualify as such because he did not post earnings in this position that demonstrate substantial gainful activity. (*Id*. at 10-11.)

The Commissioner argues the ALJ properly determined Webb has the residual functional capacity to perform a range of medium work despite his impairments. (Doc. No. 16 at 5-9.) She argues the ALJ considered all of the evidence of record in fashioning the RFC, including evidence that Webb had relatively conservative treatment for his back pain and was independent with ambulation and numerous activities of daily living. (*Id*.) The Commissioner also argues the ALJ properly considered the fact that Webb's lumbar x-rays showed only minor

degenerative changes and, further, that physical examinations consistently revealed normal gait, intact sensation, full motor strength, and no radicular symptoms or neurological deficits. (*Id.*) The Commissioner also notes that the RFC is consistent with both Dr. Amiri's opinion, and Dr. Hsaio's conclusion that Webb would have only minimal restrictions on sitting, standing, and lifting weights. (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[4] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184

---

[4] This regulation has been superseded for claims filed on or after March 27, 2017. As Webb's applications were filed in March 2015, this Court applies the rules and regulations in effect at that time.

(SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Webb suffered from the severe impairment of "disorders of the back, degenerative disc disease." (Tr. 12.) After determining Webb did not meet or equal the requirements of a Listing at step three, the ALJ proceeded to discuss the medical and opinion evidence at step four. (Tr. 12-16.) The ALJ first acknowledged Webb's complaints of severe back pain that traveled up his body into his neck. (Tr. 14.) The ALJ noted Webb's testimony he could stand for two to four hours before needing to sit down and walk about four blocks at a time, as well as his claim he needed a cane for stabilization to walk long distances. (*Id*.) The ALJ then discussed the medical evidence regarding Webb's back condition as follows:

> The medical evidence supports the claimant's back impairment. The claimant receives medical treatment at Metro Health (Exhibit B1F, B2F, B3F, B4F, and B5F). The record indicates the claimant's treatment for his back has been relatively conservative. The claimant reported that he initially injured his back in a motor-vehicle accident in 1997 (Exhibit B1F:15, 17). X-rays of the claimant's spine on December 19, 2014 noted minimal degenerative changes of the lumbar and distal thoracic spine with no acute osseous abnormality (Exhibit B1F:35). The medical record has numerous indications where the claimant reported lower back pain. On examination, the claimant has been noted to be independent with ambulation (Exhibit B1F:22). He has been encouraged to work on extension based lumbar exercises and core strengthening to decrease his pain symptoms (Exhibit B1F:15). Physical examination by Daniel Malkamaki, M.D., in July of 2015 was grossly normal with sensation intact to light touch generally, with motor

strength grossly at 5/5 with a normal gait (Exhibit B4F:4). No radicular symptoms or neurological deficits were noted.

There are indications in the record that the claimant has gone periods-of-time without medication when he runs out or forgets to refill his medication. On September 30, 2016, the record indicates that the claimant was seen for back pain. At that time, the claimant reported that he was out of Lodine and Cymbalta for a month, and had not refilled either medication (Exhibit B5F:2). The record notes that the claimant's prior visit was January 22, 2016. He noted that his back pain in September was about the same as it was in January. He noted that when he does take his Lodine medication he gets mild relief (Exhibit B5F:2). On examination, it was noted the claimant had mild degenerative disc disease, per the 2014 x-ray. Neurological exam was noted to be grossly normal with sensation intact to light touch. Motor activity was grossly 5/5, with a normal gait (Exhibit B5F:4). The claimant's back pain has been considered in reaching this decision.

(Tr. 15.) The ALJ then determined that, while the record supported Webb's reports of significant pain, his "significant activities would indicate the pain may not be as severe" as alleged. (Tr. 15-16.)

With regard to the opinion evidence, the ALJ accorded only "some weight" to Dr. Sutherland's opinion that Webb did not have a severe physical impairment, explaining "I find that the claimant does have a severe impairment of back disorder and have provided limitations in the residual functional capacity above." (Tr. 16.) The ALJ accorded "great weight" to Dr. Amiri's opinion that Webb could perform medium work. (*Id.*) The ALJ formulated the following RFC:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant has no limitations on pushing or foot pedal. The claimant can constantly use a ramp and stairs. The claimant can frequently use ladders, ropes, and scaffolds. The claimant can constantly balance, kneel, and crouch. The claimant can frequently stoop and crawl. The claimant can constantly reach, handle, finger, and feel. The claimant can constantly see and communicate. The claimant has no environmental limitations.

(Tr. 13.)

The Court finds the RFC is supported by substantial evidence. The ALJ fully discussed Webb's hearing testimony and the medical evidence regarding his chronic back pain. As set forth above, the ALJ acknowledged Webb's consistent reports of lower back pain, but noted his relatively conservative treatment, generally normal physical examination findings, and minimal degenerative changes as documented in his December 2014 lumbar x-ray. (Tr. 14-15.) In addition, the ALJ observed that Webb went periods of time without medication, either when he ran out or forgot to refill his prescriptions. (*Id.*) The ALJ also found Webb's "significant activities" were inconsistent with his allegations of disabling pain. (Tr. 16.) Finally, the ALJ expressly relied on the opinion of state agency physician Dr. Amiri that Webb was capable of performing medium work. (Tr. 17.)

Substantial evidence supports the RFC. As discussed at length *supra*, treatment records reflect generally conservative treatment for Webb's chronic back pain, including physical therapy, home exercises, heating pads, and non-narcotic pain medication. Webb cites no evidence that any of his treating physicians suggested more aggressive treatment, such as injections, nerve blocks, and/or surgical intervention. To the contrary, in October 2015, Dr. Darcy specifically advised Webb that "since his pain is not acute, opiates are not an appropriate treatment option" and indicated "we really don't have anything else to offer." (Tr. 420.) The ALJ also correctly noted that x-rays of Webb's spine consistently revealed minimal degenerative changes. Specifically, in December 2014, a lumbar x-ray showed "minimal degenerative changes of the lumbar and distal thoracic spine with no acute osseous abnormality." (Tr. 344.) A May 2016 x-ray showed only "minor degenerative changes of the thoracic spine with small marginal spurs;" mild thoracic dextroscoliosis, no acute fracture or

abnormal subluxation, degenerative changes at C5-6 and C6-7, and "possible anterolisthesis" at C6.  (Tr. 464.)

In addition, substantial evidence supports the ALJ's finding that physical examination findings were largely normal during the relevant time period.  In October 2014, Webb had full range of motion in his back, no bony tenderness, no radiculopathy, no neuro-focal deficits, negative straight leg raise, full muscle strength in all extremities, and normal gait.  (Tr. 388.) Treatment records from PM&R from October 2014, December 2014, July 2015, October 2015, January 2016, May 2016, and September 2016 documented normal curvature of Webb's thoracic and lumbar spines, negative straight leg raise, 5/5 muscle strength in his lower extremities, intact sensation, normal reflexes, and normal gait.  (Tr. 383, 340-341, 402-403, 419-420, 428, 460, 480-481.)  In addition, Dr. Kieber-Emmons consistently noted no spinal tenderness and/or normal gait.  (Tr. 375, 305, 301.)

The medical opinion evidence also provides substantial evidence in support of the RFC.  As noted above, state agency physician Dr. Amiri reviewed Webb's medical records in July 2015 and determined Webb was capable of performing medium work; i.e., that he could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 75-76.)  Dr. Amiri also found Webb could frequently crawl, stoop, and climb ladders/ropes/scaffolds and, further, that he had an unlimited capacity to balance, kneel, crouch, push/pull, and climb ramps/stairs. (*Id.*)  Notably, Webb does not direct this Court's attention to any evidence that his treating physicians opined more restrictive limitations than that set forth in the RFC.  Indeed, to the contrary, when asked to complete disability paperwork on Webb's behalf, Dr. Hsaio specifically

noted that, "[b]ased on the fact that he has axial back pain without neurological deficits, minimal findings on x-ray, and his overall symptoms profile, he would have minimal restrictions on sitting, standing, and lifting weights." (Tr. 256.)

Finally, the ALJ determined that Webb's "significant activities would indicate the pain may not be as severe" as alleged. (Tr. 15-16.) This finding is supported by substantial evidence. As the ALJ noted earlier in the decision (Tr. 14), Webb testified at the hearing that he cleans the house, goes to the laundromat, and does yard work. (Tr. 37.) Webb has not directed this Court's attention to any evidence in the record contradicting this finding or otherwise demonstrating he is significantly restricted in his ability to perform his activities of daily living.

Webb nonetheless argues remand is required because the ALJ failed to acknowledge certain abnormal physical examination findings in the record, including limited range of motion, tenderness to palpation, "shuffling gait," and poor posture. The Court finds this argument to be without merit. It is well-established that an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx 661, 665 (6th Cir. 2004); *Collum v. Berryhill*, 2018 WL 3861839 at * 6 (N.D. Ohio Aug. 14, 2018); *Jackson v. Comm'r of Soc. Sec.*, 2016 WL 5523958 at * 10 (N.D. Ohio Sept. 30, 2016) (stating that, "for her decision to stand, an ALJ need not point to every piece of evidence in the record") (citing *Thacker,* 99 Fed. Appx. at 665.) While the ALJ herein did not specifically reference the abnormal physical examination findings noted above, it is clear from a review of the decision as

a whole that the ALJ fully considered the medical evidence regarding Webb's chronic back pain. Moreover, and as discussed above, in light of Webb's conservative treatment, minimal findings on x-ray, and generally normal examination findings, he has failed to demonstrate the RFC is not supported by substantial evidence.

Although Webb cites evidence from the record that he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ' s decision "cannot be overturned if substantial evidence supports the claimant 's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm' r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). In the instant case, the ALJ clearly articulated his reasons for finding Webb capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. Accordingly, Webb's argument that the ALJ erred in formulating the RFC is without merit.[5]

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 6, 2018

---

[5] Because the Court finds the RFC is supported by substantial evidence, the Court need not address Webb's argument that the ALJ erred in determining his previous work experience as a bartender constituted "past relevant work" for purposes of social security regulations.